Next case we're in here this morning is APAC-Atlantic v. Owners Insurance. And Ms. Dagger, whenever you're ready, we'll hear from you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I'm Kelly Margolis-Dagger. I represent the appellant, APAC-Atlantic. The District Court applied the wrong law to conclude that APAC was not entitled to coverage as an additional insured for liability arising out of Emory's work for APAC. In doing that, the District Court also overlooked undisputed facts that considered under the right standard would show that APAC's liability did arise out of Emory's work for APAC. Two motorcycles crashed in western North Carolina, leaving one driver dead and two injured, because Emory put the wrong signs in the wrong location on a paving project that APAC was involved in. APAC was the prime contractor. It is undisputed that Emory installed uneven pavement signs on that project as a subcontractor for APAC. The underlying plaintiffs, the parties who were injured and their representatives, sued APAC. APAC paid a settlement in that case, and that liability arose out of Emory's work for APAC. So APAC is entitled to coverage under the plain language of the owner's policies at issue in this case. Is it undisputed that the subcontractor installed both the work zone signs and the uneven pavement signs? Yes, Your Honor. And is there any evidence that the contractor installed those signs? The prime contractor being APAC?  No. The prime contractor did not install the uneven pavement signs. Well, that's what I assume. So your argument is just simply that because liability in part is alleged because of the misplacement of the signs, therefore, APAC's liability arises out of the work of the sub? That's right, Your Honor, but I'm going to add one thing to that. Because that's alleged, but also because in the underlying lawsuit, the plaintiffs offered evidence to support that allegation. It's not disputed, I don't think, in this record. I don't think it is either, Your Honor. All right. Is there really any more to your claim? I wouldn't say so, Your Honor. No. No. It's that simple. It's not disputed. I mean, it doesn't depend on whether there's contributory negligence or whether there's master servant or any of that. This Pulte opinion basically says all you have to do is look out whether it's rising under that work. That's right. I agree with that, Your Honor. And the district court just got it wrong. The district court relied instead on an Ohio case, and the Ohio case sets a different standard for what arising out of means in an insurance policy that actually does require a showing of the named insurance negligence, which, as Your Honor noted, Pulte does not. So the district court got it wrong by relying on that different Ohio standard. The North Carolina Supreme Court has made it clear arising out of is a broad standard. It's ambiguous in an insurance policy, so it's construed in favor of coverage, and it doesn't require a showing of negligence by the named insured. It also doesn't require APAC to disprove its own negligence. Because the record is replete with, again, we contend to be undisputed facts, showing that the subcontractor, Emory, did install these uneven pavement signs and put them in the wrong place, that's enough under North Carolina's more generous standard to show that APAC's liability arose out of Emory's work for APAC and entitles APAC to coverage under the policy. I'll just touch briefly on the district court's factual analysis. So as I've said, the district court applied the wrong law. So what are you trying to persuade us now about? Well, Your Honor, I'll be very direct about this. I'm the appellant, and I'm trying to persuade this Court to reverse and remand the case for injury judgment in favor of APAC. I understand, but you just asserted to me that the facts were undisputed, and I seem to think so, too. I read the record. I read, actually, the testimony, and it looks to me like Emory installed both the work pavement signs and that those signs were allegedly in the wrong spot. Yes, Your Honor. And the liability of APAC arises out of the placement of the signs. I agree, Your Honor. So now what more do you need to argue about the facts? Well, with that, I'll just reserve my remaining time for rebuttal and ask the Court to reverse and remand for injury of summary judgment in favor of APAC. Thank you, Your Honor. All right. Mr. Bolster. Thank you, Your Honor. Please, the Court. Jeff Bolster here for Owner's Insurance Company. It looks like I've got some work to do. Well, I, you know, I assume you agree with the fact of what Emory did at the site and placing both the work signs and the uneven pavement signs, and that APAC's liability is alleged to be in part based on the misplacement of the signs, right? To an extent, Your Honor. These accidents, the death and the severe injuries had nothing to do with the work of Emory Silco. Let me ask you, did they have anything to do with the placement of the signs? Your Honor, JA 458. Now, just answer my question. Not the sign that Emory Silco was hired to install and didn't install. I understand that. You know, you're obfuscating. The contract they had was work zone signs. They didn't, it wasn't the uneven pavement signs. Correct. But there was an agreement, all agreement, to put in the uneven pavement signs. That was not disputed, and there was actual payment for that, additional payment to put in those signs. So factually, are you disputing the facts that Emory put in the uneven pavement signs? I am not, Your Honor. All right. Well, and the liability in this case arises in part out of the placement of the signs, right? It doesn't. I thought the allegation was that there were two contributing factors to the accident. One is the placement of the signs, and the other was the failure to put a ramp on the pavement to, I don't know what you call it, a flange or on the edge of the raised pavement. But both were alleged, and both were discussed. I don't understand where you're coming from, that the signs had no play in this case. Your Honor, if I may, and I'm sorry if I'm going to push back about obfuscation. I can assure you, this is my first time before this Court. I've been doing this 30-some years. The last thing in the world I am going to do is come to the Fourth Circuit in Richmond, Virginia, and try to confuse or obfuscate these facts. But I would like to very much focus on what I think are the key issues. Emory Seal Co. was initially hired to do a very limited amount of work for $44,250 of a $13 million project. They went out there, they were hired to do work zone advanced general warning signage. That involved road work ahead signs, begin road work signs, and end road work signs. Those were stationary signs. They were set forth in their drawings. There was nothing in any of the drawings that said anything about uneven pavement or uneven signs. What happened was, and there's no dispute, that that work was done properly. That $44,250 worth of work was done properly. Right before paving began, a DOT representative named Mike Patton, on August 3, 2018, approached APAC and said, before this paving can even begin, we need you to go out and put uneven pavement signs. Now, you remember in the briefing, there's talks about uneven lane and uneven pavement signs. He never said, go put uneven lane signs. He said, APAC, go put uneven pavement signs out there. APAC came to Emory Seal Co. on August 3, 2018, and said, you need to go put uneven pavement signs out there, because we can't start the paving until you do. That was nowhere in the contract. It wasn't in line item 13. It wasn't in line item 13. You had a side deal. Sorry, Your Honor? You had a side deal. We had a side deal. Or an oral agreement, or an oral deal. You made a side deal. That's right. So we've got to stick to the terms of the side deal. And if you look at the evidence in the record, in Chad Emory's deposition testimony, he said he was told where to put the signs, what to do with the signs, and what signs were there to use. In fact, the DOT was out there instructing him on where those signs were to be placed. He never consulted with line item 14. This is the key of our case, the distinction between line item 13 and line item 14. We were hired to do 13. These additional uneven pavement signs were stationary signs that would have been part or a modification of 13, not of line item 14. Line item 14 was the signage requirement for the uneven signs that APEC was responsible for. APEC never delegated responsibility for line item 14 because they couldn't have. Because under the facts, under the diagram, and under the contract, under TC2 and TC4, if you look at the footnote. Well, are you saying there are disputed facts there? No. Not material facts. Your colleague on the other side said the facts are undisputed. We're not saying there are material facts in dispute, Your Honor. I'm saying that subsequently. But you don't agree what those facts are. Well, I believe efforts are being made to blur the distinction between line item and 13, line item 14. I guess I'm trying to think of a nicer way to put this question than who cares, because we're talking about the sort of oral agreement, which was put up the uneven pavement signs, and they apparently did it wrong, and hence the liability. So I guess I'm also not seeing what is hard about this. First of all, they didn't do it wrong. They did it exactly according to the oral modification. But there's no negligence required under Pulte. I agree. The idea is just whether the claim arises under the work performed. I agree. And the work was performed by Emory. Not the installation of the uneven sign. Emory put those signs up. They put the stationary uneven pavement sign that's located in this Exhibit J. Let me ask you this. Were any signs put up by the general? No. All right. All the signs involved in this case were put up by Emory. And the question is, is this a rise out of the work of Emory, which was to put up the  I don't know. We're not talking about negligence and contributory negligence. The North Carolina cases have made that clear. So I don't understand where you're headed. I'm willing to listen, but you're sort of suggesting that Emory didn't have any liability because they were following instructions. But they put them up where they put them up. All right. Can I convey something very important to you? I keep showing the Court this diagram. You've probably seen it in JA 458. That's the whole crux of their case. They're saying these signs, they should There's nothing wrong with these signs. These signs didn't cause the accident. They're saying there should have been signs down here, right? They're saying you guys I'm not saying anything. You're talking about whether it's negligence, whether it caused it, whether the result was it. But the claim, the allegation was pretty clear that there were two true contributing factors alleged to cause the accident. One was the absence of a lip coming off the higher pavement, and the other was the placement of the signs. There were no uneven pavement signs before the uneven pavement. We were not hired to place the uneven signs. It's not whether you hired us. It's whether you did the work. We didn't do the work. We weren't asked to do the work. Under the contract, Your Honor. All you have to do is to be the one that placed the signs. And you just agreed with me they placed the signs. But the sign, that sign didn't cause it. It was the absence of the sign upstream that caused it, and that was APAC's sole responsibility that they never delegated that. So you're What your argument is, you need a trial, then? I think Judge Cockburn got it right. You want to affirm Judge Cockburn? Absolutely. Just so I understand, your understanding of what happened is that APAC delegated, said you put up all of the signs except for one. We're going to put up the first sign. You're going to put up all the others every quarter of a mile. That's what happened? I'm really asking the Court to focus. Can you just answer, is that what you are saying happened? APAC had independent responsibilities for signings, and that's what's so confusing about this case. That's their negligence, maybe.  That's their negligence, but the Supreme Court, the courts in North Carolina have said it does not depend on the negligence or relative negligence. It depends on arising out of the work. That work was never delegated to Emory-Silco to put those signs in another location. If I can read the footnotes under J95, that's where many of the signage is. It says that milk areas are not paid back by the end of the workday. Portable signs shall be used to warn drivers of their present conditions, including rough roads, uneven lanes, and group payment. These portable signs are incidental to the other items of work included in the temporary traffic control lump sum pay item. That's what I have tried to emphasize in the brief and what I am going to do. Everything I can't emphasize with a limited amount of time here. They were paid $630,000 to do part of the signage. They were, and that's what's confusing. They're trying to say all of the signage because you had responsibility for part of it. Therefore, if something went wrong with the signage, it arose from your work. It did not arise from our aspect of the signage. They had an obligation, as a general contractor, when these elevations were up, and this was two or three weeks after these signs were put up, where there's milling going on, and if it's kept more than two inches or less for more than a day, they have an obligation by the end of the day to put a temporary sign up that says uneven lanes. That was never, ever delegated to Emory Silco, and it couldn't have been. We were never brought back out. We did the advanced warning signs before the project ever began. They were the ones on site. They were the ones that monitored it, and every time there was, if they went home for the evening and there was a two-inch or less lip, they had a responsibility to put that additional portable signage up that said uneven lanes, and they had a duty when the condition was mitigated to remove the lanes. It was an ongoing, evolving job site that we were never asked to deal with or never asked to participate in. We didn't come back. It was a general contractor. They were paid $630,000 for temporary traffic control, and this was part of their responsibility, and they never delegated it to us, nor could they have, because we were not on this site on a regular basis monitoring it. We were never asked or hired to accept responsibility for this portable signage. It was a day-to-day, week-to-week thing that APAC and APAC alone was responsible for. That's where it didn't arise from these signs. The signs didn't hurt anybody. What happened, it arose from the work of APAC. It was APAC, and APAC was the only responsibility for putting these portable signs up every time the two inches of pavement was covered. Well, it says here that he was asked to put up near the beginning of the job and then every half mile put those signs up. That's what he was instructed to do, and he agreed to do it. And he did it. And he didn't do it. He did it. He did it. All of the evidence in the record is that he put the signs where he was asked to put them. Those uneven pavement signs were not uneven lane signs. They were not intended to address the ongoing issue of, okay, we're milling it. There's a height differential. If we go home tonight, we've got to get signs out that say there's uneven lanes. That's not what we're talking about here with the uneven pavement, and there's an effort to confuse the uneven pavement and uneven lane signs. That uneven lane responsibility was never, ever delegated by APAC to Embry-Silco. I wouldn't be here today if it was, but it's a really, really important distinction that I obviously didn't make clear enough in my brief, but I focused almost exclusively on that, and I'm sorry it wasn't clear, and I'm doing the best I can here today. We've got a general contractor who has paid a lot of money on a project and is now, you know. How much was Emory paid for the uneven pavement signs? We don't know that, Your Honor. It's not in the record. We don't know the amount. But we've got a general contractor who was paid over $13 million for a job. They had portable signage requirement. That's the only place the responsibility was for the uneven pavement signs that were not there. We never came back out. We were not asked to do that. That was not delegated to us, and I would submit to the court, how could this have arisen from the work of Embry-Silco? Now, you say there wasn't a sign before the uneven pavement? There wasn't. Well, the guy from Emory says he was instructed to put near the beginning of the job and then every half mile. Correct. Well, isn't that his work then? That part of it is. Well, and you said there wasn't a sign put near, and yet he had to respond near the beginning. Well, keep in mind, Your Honor, that sign was installed August 11th. The paving began August 19th, eight days later. The first accident happened September 1st. When they put the uneven pavement signs there, there was no uneven pavement whatsoever. There was no uneven lanes whatsoever. The pavement hadn't even begun. He testified that he was told to put them at the beginning, near the beginning, and every half mile or so. Nothing exact, and there's no dispute that he complied with those responsibilities. But that's not the same thing as APAC's responsibility to put portable signs as the conditions dictated at the job site. And it wasn't every day. It was when there was a height differential of two inches or less. That's when the danger was created. That's when they had an obligation. At that time, if they didn't bring it up to level by the end of the day, they had to have people on site and put these temporary portable signs saying uneven lanes. And then once the condition was mitigated and it was flat, then you take the signs away. Now, this is what he says, and I don't know how you interpret that. But Harris, you gave, so-and-so gave you, that's Emery, the instruction to place uneven pavement signs beginning near the beginning of the work area and then every half mile, both eastbound and westbound. Correct, Your Honor. Now, and you tell me those signs weren't there. Those signs were there. But there was no near the beginning, eastbound and westbound. I thought you just told me about a few minutes ago there wasn't a sign at the beginning. It was near the beginning is what he was told to do. And there was a sign at the beginning. You've seen the photograph. That sign is near the beginning. And every half mile, but near the beginning in both directions, east and west. Correct, and there were. Your Honor, the oil modification was complied with. The item 13 was complied with. And I understand. It doesn't have to be. I'm missing the boat here. You just told me a minute ago there was a sign, signs that were not put up. And I'm trying to figure out. It looked to me like all the sign requirements were signed to Emery, including the uneven pavement signs. And not only uneven pavement signs, but uneven pavement signs before the work going eastbound and before the work going westbound and every half mile thereafter. And you say they weren't all there. Which one wasn't there? All of the portable signs showing that there was. No, which one wasn't there? You say one wasn't there. If I did, Your Honor, I'm saying that he did everything he was asked to do. He put the sign near the beginning. So it's near the beginning but inside and not before. Is that what you're saying? They were near the beginning but not before. And keep in mind, there was no paving going on when this was installed, right? And he said, he goes, I would have had no way of knowing where this was supposed to go. I was told by the DOT inspector to do this because it's not part of the specifications. And you rightfully said, well, you're right, it's an oral modification. So he didn't have specifications to look at to determine where the stationary uneven pavement signs would go because they're not in the specs. They're not in the contract. It's an oral modification. But you're sort of arguing the liability and the merits. And this coverage question is assigning territory, so to speak, of coverage. And the idea is that APEC is protected from any work that is performed by one of its subcontractors. And in this case, all the signage work was done by Emory. All the signage work that was done was done by Emory. And it's the signage work that's being criticized. Now, the question is whether Emory did it correctly or whether they followed instructions or whether APEC was contributory negligence. I think the Supreme Court, I mean, I don't know if the Supreme Court could be other courts, but the courts of North Carolina seem to suggest that doesn't play into the analysis.  I'm running out of time and I don't have any. No. I'd like to address it. In other words, you seem to suggest it depends on the negligence or not or the what does it depend on? The signage component of this lawsuit. If there was a signage deficiency that caused these accidents, it was the failure to install signs once the uneven pavement was created, once the uneven pavement wasn't corrected within 24 hours, to notify approaching motorists that there was current existing present conditions that were dangerous. That was the responsibility of APEC. You say APEC's the one who was at fault. A hundred percent. But it doesn't matter who was at fault. I just think you're reading a rising under to mean caused by, but that's not what it means. It means there has to be some kind of a causal connection. It can't be, in the language, it's really broad. It can't be wholly disassociated from, independent of, and remote from Emory's work with respect to the signs. And I don't see how what happened, the settlement here is wholly disassociated from and remote from Emory's signage work. It has to arise from Emory's work. Well, I just read you how the North Carolina courts construe that. I think you are reading, and I think the district court did too, reading arising from to mean caused by, at least in some sense, but that's not what it means. There has to be some causal connection. It doesn't have to be to the level of approximate cause. There has to be some causal connection. And there simply wasn't. And I'm going to sit down, and the last thing I'm going to say is line item 14 was their responsibility. That is the signage defect. That's an issue in this lawsuit. They're the ones responsible for it. It was an absence of signage that they failed to do, not signage that we installed or that Emory Sokol installed. Thank you. Was this on Route 74? Yes. Well, what's references to Route 17? I think Brice got references to Route 17. Okay. And Route 74 both, and almost interchangeable. Can you explain that? I can't, Your Honor. I apologize. I'm just confused. Yeah, I don't have that. That's all right. I apologize. Thank you. Your Honor, I wish we could come to understand a little more what you're arguing, because you're obviously frustrated, and we want to fully understand it. But I think our pushback here is to have you recognize the breadth of the arising  I mean, the extent to which the law is broken under goes beyond the relative negligence of either party. And it's not line 14 of the contract. It's line 14 plus the agreement that they made, the side agreement they made at the beginning of the project. I agree, Your Honor. But that side agreement didn't include uneven lane signs. No, it included uneven pavement signs. And I think that's sort of immaterial, because the signs, if they were the wrong signs, it's still the work of Emory. If Emory put up an uneven pavement sign and you say it should say uneven lane sign, that's still their work, right? Yes, Your Honor. It was the failure on Apex Park to put the portable uneven lane signs is what's the issue here. It's not the permanent stationary sign that was installed. Well, the testimony they talked about was uneven pavement signs. They go back and forth on that, but you're right. Yeah. Okay. All right. Thank you, sir. Thank you. My name is Dagger. Thank you, Your Honor. Judge King, to your question, my co-counsel, Mr. Malone, tells me that Highway 17 and 74 connect. Connect? Somewhere out there. They connect somewhere, and that may be the reason for the variable references. I hail from the eastern part of the state, and I don't pretend to be an expert on that. You don't know? I'm not an expert on any roadways, but I can get from Raleigh to Richmond. Your Honor, just briefly, I think that's... I understand the argument, and I'm trying genuinely to understand it. The argument is that the work relating to signs was divided, and not all of it was given to Emory, and part of it was retained by APEC. This arose out of the part that was not given to Emory somehow. I think that's the argument. I agree, Your Honor. I think that is the argument. And we contend that the argument, really, that the district court accepted and that owners is making is one that goes far beyond what North Carolina law requires when we're asking whether the liability is one arising out of the work of Emory for APEC. So the fact that APEC may have been able to do something different or additional, or maybe should have done something different or additional... Well, they were required to put in signs, but it seems to me, in reading the record, they were hired under Line 14 to put in work zone signs for $44,000, and they did that. And then, before the project, when there was additional signage required, regardless of what it was, APEC didn't take that on itself. It gave that to Emory, which seems to indicate that the relationship between Emory and APEC was that all signage would be taken care of by Emory, because there was no signs put in by APEC, and they never assumed any to do that work themselves. They intended to subcontract it out. They only contracted out the work zone signs in the contract, and they added, when it became necessary for additional signs, uneven pavement signs, they again had Emory do that instead of doing that themselves. So I'm not sure there's any evidence that there was divided work, that APEC retained signage responsibilities. I think the work... The work was done by Emory. Yeah. All signage work. Effectively, all signage work was done by Emory. I think it's a different question... You say effectively all? Sorry. Let me just take out effectively. All the signage work was done by Emory. I think it's a different question whether every bit of signage work contemplated in the NCDOT contract was done. So it's a different question whether... And that's where I think owners is pointing to the NCDOT contract and saying, here are all these requirements for signage. APEC... You mean all the signs that were needed weren't put up. Is that what you mean? Right. I think that's exactly... I think that's what owners is saying. They're saying, well, there should have been even more signs put up. Well, I don't quite understand that. I thought it was a misplacement of signs because the description by the Emory representative was that he was told to put up uneven pavement signs near the beginning, both eastbound and westbound, and every half mile... That's right. ...through the project. That's right. Now, was there any other signage required? Any evidence of any other signage required? Well, there are... I mean, so Emory put up various other work zone advance warning signs. Well, I said those were work signs. That's right. But they had the full responsibility for that, too. So here's what I think... Well, what was the side deal? Well, the side deal was, as Mr. Emory testified in his deposition, to put up uneven pavement signs near the beginning of the project and every mile thereafter, excuse me, half mile, and that matches line item 14 in the NCDOT contract, which deals with the rest of the signage. And so if Mr. Emory testified, he didn't look at that contract. But if he had, he would have seen it said, you know, the signs need to start before the uneven pavement. And Mr. Emory testified he knew where the paving was going to start. It's not like there was a base image on that. So you're focusing on really what Judge Harris just asked about, near the beginning... That's right. ...is not precise enough. It had to be near the beginning but before. Before instead of after the beginning.  So if owners is saying, and, Your Honor, I'm sort of running out of time. Is that the deficiency? Question? Could I exceed my time and answer that question, Your Honor?  Yeah, I mean, that may be what owners is saying. It may be that they're saying, okay, well, the oral modification was just near the beginning, and we did this near the beginning. But Mr. Emory said they knew where the paving was going to start, and he admitted that the first sign they put up was after that. And the accidents happened, at least in part, because there was no advance warning of the uneven pavement. So that's Emory's work in placing those signs along the roadway and starting too late. It's that simple. All right. Thank you, Your Honors. All right. We'll come down and brief counsel and then take a short recess. This Honorable Court will take a brief recess.
judges: Paul V. Niemeyer, Robert B. King, Pamela A. Harris